UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-62746--Civ-WILLIAMS

OTIS BROWN,

    Plaintiff,

vs.

RYDER SYSTEM INC. and
GARY GRAY,

    Defendants.
_____/

## ORDER ON SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment [D.E. 46] and Motion to Seal Exhibits B and C of Defendant's Record [D.E. 50]. The Plaintiff filed a timely Response[1] [D.E. 58] and Defendant replied [D.E. 61]. For the reasons discussed below, the Motion for Summary Judgment is DENIED. The Motion to Seal is GRANTED. The Clerk is ordered to seal Exhibits B and C of Docket Entry 47. Defendant's Motion to Strike [D.E. 62] is DENIED WITHOUT PREJUDICE. The Court did not find it necessary to rely on Ms. Hampton's Declaration in its summary judgment analysis. Moreover, Defendants raise the same arguments in their motion *in limine*, so this matter will be heard again prior to trial.

---

[1] Defendants allege in their Reply that Plaintiff's Response was untimely and should be stricken. Plaintiff sought and received an extension of time to file his Response through and including November 13, 2012. Plaintiff filed two declarations in support of his Response at 11:54 and 11:55 PM on November 13, 2012. Plaintiff's Response was docketed at 12:17 AM on November 14, 2012. While the Court counsels the Plaintiff to be more aware of the case schedule, the Court finds that Plaintiff was attempting to comply with his deadline and had at least begun filing his materials within the allowed time. The Court will consider the merit of the Response.

1

## I. Background

Plaintiff Otis Brown began working for Defendant Ryder System as a Help Desk Technician on May 9, 2005. [D.E. 46-1, ¶ 1]. On May 22, 2006, Plaintiff became an analyst in the Information Technology Department ("IT Department") and in 2007 began working in the ID Management section of the IT Department. *Id.* ¶ 10. While working in the ID Management Department, Plaintiff was responsible for creating Lotus Notes IDs, AS 400 IDs and Active Director IDs for new users and modifying and terminating IDs for existing users of Ryder's systems. *Id.* ¶ 11. Defendant Gary Gray was Plaintiff's manager for three-and-a-half years. *Id.* ¶ 12. Although Plaintiff received positive performance evaluations for two of those years (in April 2008 and March 2009), Gray did bring up concerns about Plaintiff's continued tardiness. *Id.* ¶¶ 13-14, 16.

In 2009, Ryder underwent a reduction in force. *Id.* ¶ 17. Following the terminations, only two employees remained in ID Management (Plaintiff and Rolando Aguilar) and only two employees remained in the IT Purchasing section (Roger Hernandez and Crystal Fernandez), which was also under Gray's management. *Id.* ¶¶ 17, 18. Because of the force reduction, Gray was concerned about sufficient coverage throughout the IT Department. On several occasions, both ID Management employees were out of the office at the same time, leaving Gray without personnel to perform these functions. *Id.* ¶ 19. Consequently, Gray decided to cross-train Plaintiff to work in IT Purchasing and to train Hernandez to work in ID Management. This way, Gray testified, he had more employees with a breadth of experience, who would be able to cover in

case one department was short.[2]  *Id.*  Gray testified he chose Plaintiff for the IT Purchasing position because of his customer service skills, and chose Hernandez for ID Management because of his technical skills.  *Id.* ¶ 20.  Plaintiff disputes that he was moved for purposes of cross-training and testified that Gray switched him with Hernandez because Hernandez was performing poorly in IT Purchasing. [D.E. 59 ¶ 20]. Plaintiff did not wish to move positions but eventually accepted the transfer. [D.E. 46-1 ¶ 22].  After transferring to IT Purchasing, Plaintiff testified that he requested a change in his pay grade. [D.E. 59 ¶ 24].

Tickets are created for an individual who wants to purchase something from Ryder.  Brown's new responsibilities[3] in IT Purchasing included opening tickets (i.e. assigning himself tickets) in the "queue" that were generated by a service desk or a Ryder user and "reach[ing] out to those individuals to create purchase requisitions for the items they wanted to order and manag[ing] the tickets through their completion." [D.E. 46-1 ¶ 26].  Sometimes an order, or ticket, resulted in two purchase requisitions-- other times only one.  *Id.*  Brown and any other IT Purchasing employee received a weekly performance report, which showed how many of these tickets each employee was handling.  *Id.* ¶ 36.  The number of unassigned tickets in the queue went down as

---

[2] It is unclear from the record why such cross-training necessitated a permanent switch in positions rather than a temporary one pursuant to the training exercise.  As described above, Plaintiff argues that Hernandez suffered from poor performance and Gray was attempting to sabotage Plaintiff's job and salvage Hernandez's by switching them.  Defendant denies this was the case.

[3] Defendant contends that Plaintiff had fewer responsibilities than did Hernandez when Hernandez held the same position.  *Id.* ¶ 27.  However, Plaintiff asserts that, at least for the last few months of Hernandez's tenure in IT Purchasing, the two held the same responsibilities. [D.E. 59 ¶ 27].  Hernandez's testimony seems to corroborate Plaintiff's account. [D.E. 59-1, p. 3].  Thus, in viewing the facts in the light most favorable to the Plaintiff for purposes of summary judgment, the Court credits Plaintiff's account in this regard.

3

each was assigned to an IT Purchasing employee. *Id.* ¶ 37. Gray testified that he wanted the unassigned tickets in the queue to always remain under 40. *Id.* ¶ 38.

While in IT Purchasing, Jean Spinney was Plaintiff's "Lead" or direct supervisor. *Id.* ¶ 28. Spinney and Plaintiff had a good relationship. Plaintiff had no complaints about her and does not allege that she made any inappropriate remarks about race. *Id.* ¶ 29. Spinney had been in IT Purchasing longer than any other employee and, thus, had (as Plaintiff agrees) an understanding of how to properly work the queue and of how to set appropriate targets for the queue. *Id.* ¶¶ 30-31.

Plaintiff continued to arrive late to work while in IT Purchasing. *Id.* ¶ 32. Gray sent Plaintiff an email on July 9, 2009, to follow up on a conversation the two had on July 8, 2009. *Id.* ¶ 32. The email read, in part: "to assist you, I am asking for you to provide me your preferred schedule which you must adhere to going forward." *Id.* ¶ 33. As a result of the exchange, Plaintiff's start time was changed from 8:30 to 9:00 AM. *Id.* Nonetheless, Plaintiff began to have tardiness issues again in September 2009. Gray met with Plaintiff on November 30, 2009, and December 10, 2009, to discuss this ongoing issue. He also issued Plaintiff a written warning. *Id.* ¶ 35. Plaintiff understood that the December 2009 warning advised that a failure to rectify the situation could result in further action, including immediate termination. *Id.*

Gray and Spinney also testified that they had concerns about Plaintiff's productivity. According to them, on several occasions there were a number of open assigned tickets in the queue, meaning that tickets were not being closed in a timely manner. *Id.* ¶¶ 39, 40, 52. Plaintiff counters that the increase of unassigned tickets resulted from Defendants' decision to purchase 500 additional computers, which

increased IT Purchasing's workload by two-thirds. [D.E. 59 ¶ 39]. Supporting Plaintiff's account, Hernandez testified that after the reduction in force, the queue had become more difficult to manage, especially with only two employees. *Id.* ¶ 17. Plaintiff also testified that his performance metric, as described to him while still employed at Ryder, was based on how many tickets he was *closing*, not how many tickets remained in the queue. *Id.* ¶ 37. During the weeks that Defendants chose as a representative snapshot of Plaintiff's work, Plaintiff created more purchase requisitions than Hernandez had when he performed the job, and averaged 56 ticket closures as opposed to Hernandez's 53. *Id.* ¶¶ 55-56. Brown met the goal of closing 75 tickets per week during 6 of the 19 weeks in the sample, whereas Hernandez never closed as many as 75 tickets in a week. *Id.*

Because of Defendants' stated productivity concerns, Plaintiff and Miriam De Arce, the other dedicated IT Purchasing employee, were placed on performance improvement plans. [D.E. 46-1 ¶¶ 62, 68.] Plaintiff received his 60-day plan on April 2, 2010. *Id.* At the end of the 60 days, Plaintiff had not met his performance goals (which Plaintiff contends were unreasonable), and he was afforded a 30-day extension on his plan. *Id.* ¶ 69. Plaintiff was terminated approximately three weeks after the expiration of his plan extension. *Id.* ¶ 83. The reason given for his termination was "failure to maintain sustained improvement under the [performance improvement plan]." *Id.* ¶ 84. Ms. De Arce, a white Hispanic female, was terminated for the same reason. *Id.* ¶¶ 94-95. After Brown's termination, Donald Hardy (a black male), took over Plaintiff's job duties. *Id.* ¶ 100.

5

Plaintiff gives a different account of his termination, pointing to what he understandably classifies as racist remarks by Gray. Plaintiff testified that on one occasion Gray made statements about "pimps and hos" in Atlanta and that such individuals were Mr. Brown's "peeps." [D.E. 59 ¶ 101]. Gray acknowledges discussing "pimps" in the context of the reduction of force at Ryder and how the Ryder employees should be thankful for keeping their jobs, because at his former sales job he was forced to "sell to pimps and dancers." *Id.* ¶ 99. Gray denies using the word "hos" or referring to "pimps and hos" as Plaintiff's "peeps." [D.E. 48-1, p. 4-5]. Plaintiff also testified in his deposition that Gray talked about how "they used to string them up in Alabama . . . you know about that, Otis." [D.E. 51-1, p. 42]. Gray denies making any comment about stringing people up. [D.E. 48-1, p. 4-5]. Plaintiff alleges these comments were made in 2008 and 2009. Plaintiff also testified that, after he approached Gray about a pay grade raise, he overheard Gray on the phone saying "[c]an you believe that boy actually wanted me to raise him up a grade level? How fucking ridiculous!" [D.E. 59 ¶ 102]. Plaintiff alleges that he confronted Gray about his racist comments in November 2009 and immediately thereafter Gray began "the progressive-discipline process that ended in Mr. Brown's termination." *Id.* ¶ 104. Plaintiff also emphasizes his superior performance over Hernandez while in IT Purchasing.

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly

preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or others materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. Analysis

Discrimination claims under § 1981 are analyzed using the same framework and evidentiary requirements as a Title VII claim. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011). A plaintiff may prove a race discrimination claim through either direct or circumstantial evidence. *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999). Additionally, the remarks must be made by decision

7

makers and related to the decision-making process itself. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

In the absence of direct evidence of discrimination, these claims are analyzed under the parameters put forth by the Supreme Court in *McDonnell Douglas Corp. v. Green.* 411 U.S. 792, 802-05 (1973).[4] Under the *McDonnell Douglas* test, a plaintiff must first make out a *prima facie* case of discrimination by showing that: "(1) []he belongs to a protected class; (2) []he was qualified to do the job; (3) []he was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citation omitted). To be "similarly situated," the "preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant aspects." *Smith*, 644 F.3d at n.17 (citing *Holifield v. Reno*, 155 F.3d 1555, 1562 (11th Cir. 1997)). The Eleventh Circuit has held that comparator employees must be "nearly identical" to the plaintiff. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004); *see also Sumerlin v. AmSouthBank*, 242 Fed. App'x. 687, 690 (11th Cir. 2007)(per curiam).

"Once the plaintiff has made a *prima facie* case, a rebuttable presumption arises that the employer has acted illegally. The employer can rebut that presumption by

---

[4] Relying on *Smith*, Plaintiff contends that he may also prove a claim of discrimination by "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328. The Court in *Smith* found that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," and instead allowed a court to deny summary judgment based on a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). Because the Court determines that Plaintiff survives the *McDonnell Douglas* analysis, the Court need not consider the *Smith* test.

8

articulating one or more legitimate non-discriminatory reasons for its action. If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Alvarez*, 610 F.3d at 1264. In order to show pretext, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* at 1265 (citation omitted). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

Here, both Parties appear to agree that there is no direct evidence of discrimination.[5] Gray's alleged remarks about "pimps and hos" and "stringing them up" certainly would constitute "blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]. . . ." *Damon*, 196 F.3d at 1359. Additionally, it is undisputed that Gray made the decision to terminate Plaintiff, thus the requirement that the decision-maker made the discriminatory remarks is met. However, Defendant argues that the remarks were not close enough in temporal proximity or related to Plaintiff's termination and Plaintiff admits in his statement of material facts that Gray's remarks were not made in connection with his transfer to IT Purchasing, disciplinary actions or discharge. [D.E. 46-1 ¶ 98, [D.E. 59 ¶ 98]. Therefore, in light of the Parties'

---

[5] In footnote 2 of Defendants' Motion, Defendants explicitly argue that Gray's remarks about "pimps and hos" and "stringing them up" were not evidence of direct discrimination because the remarks were not related to Plaintiff's discharge or close in temporal proximity to his discharge. Plaintiff appears to accept this analysis, and instead argues that these remarks demonstrate pretext, which belies the legitimate business reason given for Plaintiff's termination.

9

arguments, the Court will analyze the discrimination claim under the *McDonnell Douglas* analysis.

Defendant does not dispute that Plaintiff is a member of a protected class, was qualified for his position, and experienced an adverse job action. Defendants argue that Plaintiff cannot point to a similarly-situated individual who was treated differently or demonstrate that he was replaced by someone outside his protected class. Plaintiff acknowledges that he was replaced by another black male, Donald Hardy. Plaintiff also acknowledges that an obvious comparator, Miriam De Arce, who was the other IT Purchasing employee, was also placed on a performance improvement plan and then terminated for failure to meet her performance goals. Ms. De Arce is a white Hispanic.

Instead, Plaintiff points to Roger Hernandez as another comparator. Plaintiff testified that he was forced to switch positions with Hernandez because Hernandez was not performing well in IT Purchasing. Plaintiff also argues he was held to a higher standard in his IT Purchasing position than Mr. Hernandez had been. Defendant concedes that Plaintiff was required to meet certain performance goals, but explains that Plaintiff himself requested that he be given certain goals so he would have a better understanding of Defendants' expectations. Moreover, Defendants assert that Hernandez had higher levels of responsibility in IT Purchasing; however, as Plaintiff points out, Hernandez testified that "we all did the same job." [D.E. 59-1, p. 3]. Hernandez also testified that with only two employees left in IT Purchasing after the reduction in force, keeping up with the demands of the queue were more difficult. *Id.* at 5. Consequently, for purposes of summary judgment, the Court finds Hernandez to be an appropriate comparator. Subsequent to the reduction in force but prior to his

transfer, Hernandez performed the same duties in IT Purchasing that Plaintiff would be expected to perform when he was transferred to IT Purchasing. While Hernandez did have more responsibility as "Lead" before the reduction in force, Defendant acknowledges that after the reduction in force Hernandez "did the same job" as the others in IT Purchasing. Defendant also argues that the demands placed on Brown were less than those placed on Hernandez because of certain changes made in the system, but Plaintiff argues the opposite — that the numbers actually increased and he was held to a higher standard than Hernandez. Moreover, the Plaintiff's account of what actually constituted the appropriate performance metric is persuasive. With the increase of computers and users, the amount of tickets in the queue would increase and was outside the control of the IT Purchasing employees. What they could control was the number of tickets they closed. In sum, Hernandez held the same position as Plaintiff. Furthermore, Plaintiff alleges that Hernandez was also identified as having performance issues but rather than being fired, Hernandez was transferred (to Plaintiff's old position). Thus, Hernandez constitutes a comparator for summary judgment purposes, is outside Plaintiff's protected class, and was treated differently. The Plaintiff meets his *prima facie* case under *McDonnell Douglas.*

    Defendants have given several credible, legitimate business reasons for Plaintiff's termination—his tardiness and his inability to meet his stated performance goals. These issues are well documented throughout the record. Thus, the burden shifts back to Plaintiff to demonstrate that the given reasons are pretext for discrimination. Plaintiff argues a plethora of reasons for the Court to find pretext, but

the Court finds only two[6] compelling: the alleged racist remarks of Defendant Gray and the changed performance metrics.[7] While remarks that are "isolated and unrelated to the employment decision" are not evidence of direct discrimination, "such comments may *contribute* to a circumstantial case for pretext." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002). And as the Supreme Court pointed out in *Ash v. Tyson Foods, Inc.*, the mere use of the word "boy," standing alone, may be enough to support a finding of racial animus (depending on the context, inflection, tone and historical use). 546 U.S. 454, 456 (2006). Moreover, unlike the single remark in *Rojas*, where the Eleventh Circuit did not find sufficient evidence for pretext, Plaintiff has alleged a set of inflammatory, discriminatory and offensive remarks that were made to and about him-- the use of terms like "pimps and hos," "boy" and "stringing them up" have direct, negative racial connotations. The allegation[8] that these remarks allegedly occurred on three separate occasions "considered together with" the evidence regarding changing performance standards gives the Court sufficient basis to find that, viewing the evidence in the light the most favorable to Plaintiff, a jury could find pretext in the Defendants' decisions on the basis of race. Plaintiff's evidence that he exceeded Hernandez's

---

[6] The argument that Plaintiff's late arrivals did not continue is refuted by Defendant's time sheets, which appear to demonstrate habitual tardiness. [D.E. 61-3].

[7] Plaintiff argues that the performance metrics to which he was being held were unreasonable and unfair. It is axiomatic that the Court should not dictate to businesses how to measure the performance of their employees. Significantly, Ms. De Arce was also held to the same standards. And as *Rojas* reminds us, "we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas*, 285 F.3d at 1342. However, the Defendants' explanation of how they evaluated performance did seem to shift after Plaintiff's termination. First, Mr. Brown was held responsible if he did not close a certain number of tickets [D.E. 59 ¶ 37], but now Defendants state that the most important measure was how many tickets in the queue were left open [D.E. 46-1 ¶ 38]. It is this shift, not the metrics themselves, that is germane to the Court's analysis.

[8] Upon review of Plaintiff's deposition, Plaintiff's testimony on these comments is often equivocal and occasionally evasive. However, a determination of the credibility of Plaintiff's testimony is a jury question that is not appropriate for the Court to resolve on a summary judgment motion.

performance numbers and Defendants' changing explanation for what was required of Plaintiff, when combined with the alleged comments, give rise to a question of material fact. Therefore, summary judgment is DENIED.

DONE AND ORDERED in chambers in Miami, Florida, this ___ day of January, 2013.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE